UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JONATHON L. BURGHARD,
PLAINTIFF

VS.

COMMISSIONER OF SOCIAL
SECURITY,
DEFENDANT

CASE NO. 1:06-CV-612
(WEBER, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Depending on whose perspective is considered, this is a redetermination or cessation case. Plaintiff, while a minor, was previously determined to be disabled at age six, but his disability ceased in February, 2004, when he was eighteen years of age. The cessation was affirmed upon reconsideration. Plaintiff therefore requested a hearing and obtained two hearings, one in June and another in December, 2005 before an Administrative Law Judge (ALJ) in Cincinnati, Ohio. Plaintiff testified as did his mother, Virginia Petak, Medical Expert, Milton Foreman, Ph.D., and Vocational Expert, Micha Daoud, M.A. An unfavorable decision was reached in January, 2006 and from that decision, Plaintiff processed an appeal to the Appeals Council, which denied review in July, 2006. Plaintiff then timely filed his Complaint with this Court in September, 2006.

## STATEMENTS OF ERROR

Plaintiff asserts two Statements of Error, which will be considered in reverse order. The first is that the ALJ erred in determining that Plaintiff's disability ceased. The second is that the ALJ erred by failing to find that Plaintiff met Listing 12.05C and D.

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Plaintiff, known affectionately as "JJ," testified that he is a single father of one child, a

two-year-old, and that he lives with his parents in their home in Hamilton, Ohio. He graduated from Lakota West High School in 2004, but attended special education classes. Plaintiff admitted to a juvenile adjudication for domestic violence. He has been working as a janitor for Cincinnati Mills and earning $7.00 per hour for a 30-hour work week. The job description includes emptying trash and cleaning bathrooms. He does not possess a drivers license because of difficulty with the written test. When asked about his disability, Plaintiff stated that "There's certain things that I can't comprehend like other people," but in his opinion, he was able to do the job "okay." He was unable to tell the ALJ how much he weighed, how much he earned on a monthly basis or whether or not he was supposed to be taking medications.

Plaintiff's mother testified only briefly. She expressed the opinion that her son's supervisor considered him lazy and was trying to force him out. (Tr., Pgs. 433-455).

## THE MEDICAL EXPERT

The Social Security Administration secured the services of Milton Foreman, Ph.D., to examine Plaintiff's medical record and voice an opinion. Dr. Foreman testified that Plaintiff has Attention Deficit Hyperactivity Disorder, a reading disorder, alcohol abuse and borderline intellectual function. He took stimulant medication for ADHD from age seven to sixteen and then stopped.

Dr. Foreman pointed out certain inconsistencies in the opinion of a colleague, Jennifer O'Donnell, Psy.D. Dr. Foreman said that Dr. O'Donnell rated, by means of a checkmark, Plaintiff's ability to interact appropriately with supervisors as "marked," and later indicated in a written narrative that this function was "moderately impaired." Dr. Foreman placed more credence on the narrative, with which he agreed. Dr. Foreman testified that when Plaintiff was six years of age, his intelligence scores were in the "mild mental retardation range" and his GAF of 50 indicated "serious symptoms." Three years later, a school psychologist administered an IQ test with a verbal IQ of 57, which would be in the "moderately retarded range." Dr. Foreman expressed the opinion that as children age, their IQ scores become more accurate. Dr. Foreman then cited the testing done by Dr. O'Donnell in 2003, which is eleven years after his first IQ testing at age six, and commented that Dr. O'Donnell assigned a GAF of 75 and then increased

2

the GAF to 80 in 2005, which is indicative of a "transient impairment." Dr. Foreman expressed the opinion that Plaintiff would "have the ability to consistently maintain work," but that he would have "no restrictions of daily living, mild to moderate difficulties in social functioning and moderate difficulties in maintaining concentration, persistence or pace.

On cross-examination, Dr. Foreman admitted that functional illiteracy is below the fourth grade level, that Dr. O'Donnell graded Plaintiff's reading level at the fourth grade level, 3rd percentile in 2003, and at the second grade level, ½ percentile in 2005. Dr. Foreman described Plaintiff's improvement in demonstrated intellectual capacity as steady, but not significant. (Tr., Pgs. 456-489).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical question put to the VE asked her to assume a number of things as listed below:

(1) In December, 2003, Plaintiff had a verbal IQ of 78, a performance IQ of 77 and a full scale IQ of 76. Plaintiff was diagnosed with ADD and inhalant abuse, the latter of which was in remission.

(2) In August, 2005, Plaintiff had a verbal IQ of 71, a performance IQ of 77 and a full scale IQ of 72. Plaintiff was diagnosed with ADHD, a reading disorder and inhalant abuse in remission.

(3) Assume Plaintiff has:

- moderately impaired ability to relate to others,
- the ability to perform simple, repetitive tasks not requiring complicated instructions,
- the ability to do well working with the public,
- moderately impaired ability to understand, remember and follow instructions,
- borderline intelligence,
- moderately impaired ability to maintain attention and concentration,
- ability to comprehend and complete simple, routine activities,
- good pace and persistence,

3

- moderate ability to withstand stress and pressure.

The VE responded that Plaintiff could perform his past relevant work as a janitor at the medium and unskilled level, as well as the jobs of stocking clerk, packing and handling person and cleaning person, all of which existed in representative numbers in the national economy.

The second hypothetical asked the VE to assume all the limitations suggested by Dr. O'Donnell in her August, 2005 report (Exhibit 14F). The VE responded that Plaintiff could at least perform the jobs of cleaner and hand packager.

The last hypothetical was directed to Plaintiff's own statement of his ability to work, and the fact that he was working as of the date of the hearing, and had so worked since August, 2004. The ALJ asked the VE to assume the credibility of Plaintiff's own statement and, of course, the VE testified that if Plaintiff's own assessment of his abilities was correct, he could work because he was, in fact, working currently.

## THE OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff had severe impairments of borderline intellectual functioning and attention deficit hyperactivity disorder. She further found that neither impairment met or equaled any Listing, but that he had some limitations or restrictions, more fully described in Exhibit 14F, the opinion of Dr. O'Donnell, and that his employment should be limited to simple repetitive tasks in a structured environment, with simple straight-forward instructions The ALJ found that Plaintiff had a moderate impairment of his ability to maintain attention and concentration and his ability to withstand stress and pressure was mildly impaired. The ALJ found that Plaintiff had the residual functional capacity to work as an unskilled janitor or as an unskilled hand packager.

## THE MEDICAL RECORD

Plaintiff took the Stanford Early School Achievement Test when he was in kindergarten at age 6 in 1992. His score was in the 7th percentile. (Tr., Pg. 85). His mother began to recognize his deficiencies and he was placed in a special education program, at Madison Elementary School, Western Elementary School in Lexington, Garfield Junior High School in Hamilton., and

4

at Lakota West High School and became subject to an individualized family service plan (IFSP). (Tr., Pgs. 86-124). Plaintiff's teacher, Kathryn Brown, at Madison Elementary School, indicated that Plaintiff "was not functioning academically or socially at an age appropriate level" in May, 1997. (Tr., Pg. 128). He became subject to an individualized education plan (IEP) when he was in the 5th grade because of a significant weakness in reading. (Tr., Pgs. 130-134). Adderall was prescribed for his ADHD. (Tr., Pgs. 140 and 146). When Plaintiff was in the eighth grade, he was reading at the lower third-grade level. (Tr., Pg. 147).

IQ testing done at Eastern Elementary School in Mansfield in 1995 indicated that Plaintiff had a Verbal IQ of 57, a Performance IQ of 82 and a Full Scale IQ of 68 on the Wechsler Intelligence Scale for Children II. The school psychologist indicated that his "scores in both math and reading were in excess of two standard deviations below the mean" as were his scores in all areas of adoptive behavior. The school psychologist indicated that these scores indicated "moderate to severe" deficits. (Tr., Pgs. 155-156). When Plaintiff entered Lakota West High School, he was placed in a special education program. (Tr., Pg. 193). He failed on each of nine categories of the Ohio Ninth Grade Proficiency Test. (Tr., Pg. 221).

Earlier IQ testing by J. Joseph Konieczny, Ph.D., in 1992 resulted in a Verbal IQ of 67, a Performance IQ of 72 and a Full Scale IQ of 68. Dr. Konieczny rated Plaintiff's verbal skills and overall intellectual capabilities as in the "deficient range," while his performance skills were in the "borderline range." Dr. Konieczny assigned a GAF of 50 and diagnosed Plaintiff with "mild mental retardation." (Tr., Pgs. 274-278). In July, 1992, Jane Gammel, Ph.D.,. wrote that "Child does not meet or equal any listing. He is markedly limited cognitively and moderately limited in fine motor behavior and concentration." (Tr, Pg. 283).

A consultation at Children's Hospital by Michael Thomasgard, M.D., a pediatrician, resulted in a recommendation that Plaintiff continue counseling at the Mansfield Counseling Center, and if it proved to be unproductive, Dr. Thomasgard suggested that a stimulant medication, called Dexedrine, be tried for his attention deficit hyperactivity disorder. (Tr., Pgs. 285-289). Plaintiff was later prescribed Ritalin. (Tr., Pg. 297).

When Plaintiff was 12, he swallowed a key ring and sought medical attention for its removal. The history provided to Dr. Ruffner at Group Health Associates was that he had also

5

swallowed a quarter and had it surgically removed from his trachea at age four. (Tr., Pg. 306).

In August, 1997, when Plaintiff was in the fifth grade, he was evaluated by James Rosenthal, Psy.D. The history provided to Dr. Rosenthal indicated that Plaintiff had been diagnosed with ADHD and took both Dexedrine and Ritalin. Plaintiff's mother described her son as neither violent nor aggressive, but disrespectful and stubborn. She described him as impulsive and stated that he neither follows rules nor completes tasks. He has received outpatient counseling, but never received inpatient mental health treatment. IQ testing resulted in a Verbal score of 64, a Performance score of 80 and a Full Scale IQ of 70, which is considered "borderline." Dr. Rosenthal opined that Plaintiff's "communication skills appeared impaired. His motor development appeared moderately impaired. His social development appeared mildly impaired. His personal behavior patterns appeared mildly impaired. His ability to concentrate and persist with adequate pace . . . appeared mildly impaired." Dr. Rosenthall diagnosed Plaintiff with borderline intelligence and ADHD and assigned a GAF of 61. (Tr., Pgs. 320-323).

Donna Winter, Ph.D., found that Plaintiff met Listing 12.05(D) in August, 1997 when Plaintiff was twelve years of age. (Tr., Pgs. 324-329). Dr. Winter reported in February, 2001 that Plaintiff's IQ scores were "not significantly different than in 1997 with the exception of a drop in Performance IQ." (Tr., Pgs. 335-339). Nancy Schmidtgoessling, Ph.D., evaluated Plaintiff in November, 2000, when Plaintiff was fifteen years of age. Dr. Schmidtgoessling administered the WISC III, and Plaintiff's Full Scale IQ was 67, with a Verbal IQ of 67 and a Performance IQ of 71. Dr. Schmidtgoessling's opinion was that Plaintiff's cognitive abilities are "probably in the borderline range. His fine and gross motor skills seemed adequate by observation. His receptive speech seemed adequate by observation; his expressive speech is probably mildly to maybe moderately impaired. His personal-social behavior patterns are impaired, although it is not clear how severely. During testing, his work pace was average, his persistence was below average and he was able to maintain concentration and attention." (Tr., Pgs. 330-332).

In December, 2003, when Plaintiff was eighteen years of age, he was evaluated by Jennifer O'Donnell, Psy.D. The history taken by Dr. O'Donnell indicated that Plaintiff had spent approximately eleven months in some form of juvenile detention for three incidents of domestic violence involving his mother and sister. Plaintiff admitted to having an anger control problem.

He told of being hospitalized on one occasion for suicidal ideation and admitted to multiple suicide attempts, although there is no medical evidence in this record which corroborates what Plaintiff told Dr. O'Donnell. IQ testing resulted in a Full Scale IQ of 76, a Verbal IQ of 78 and a Performance IQ of 77. IQ testing put Plaintiff in the borderline range of intellectual functioning. Results from the Nelson-Denny Reading Comprehension Test indicated that Plaintiff read at the fourth grade level. Reading tests scores put Plaintiff at the third percentile. Dr. O'Donnell assigned a GAF OF 75. Her opinion was that Plaintiff would "have difficulty managing money, but is capable of managing routine household duties." Her opinion was that Plaintiff was "very immature, has limited information, poor judgment, impaired reasoning and would have difficulty living independently." Dr. O'Donnell opined that Plaintiff's ability to relate to others is "mildly impaired by his attention deficit. He would be able to relate sufficiently for simple repetitive tasks, which do not require complicated or detailed verbal instructions." She also opined that Plaintiff's ability to understand, remember and follow instructions is "mildly impaired by his borderline intelligence, concentration and attention deficits." She expressed the opinion that Plaintiff's "ability to maintain concentration and attention is moderately impaired." His "ability to withstand stress and pressure is mildly impaired" and is an area of "significant progress in the past year." (Tr., Pgs. 340-348).

Plaintiff was evaluated by Mel Zwissler, Ph.D, in December, 2003. Dr. Zwissler agreed that Plaintiff suffers from borderline intellectual functioning and ADHD. Dr. Zwissler rated Plaintiff's restriction of the activities of daily living and his difficulty maintaining social functioning as "mild," but he rated Plaintiff's difficulty in the areas of concentration, persistence or pace as "moderate." Dr. Zwissler found that Plaintiff was "moderately limited in the ability to understand and remember detailed instructions" and that he should be "limited to simple, routine tasks." (Tr., Pgs. 349-365).

Nancy McCarthy, Ph.D., a clinical psychologist, as is Dr. Zwissler, agreed that Plaintiff should be diagnosed with ADHD and borderline intellectual functioning. The two clinical psychologists also agreed that Plaintiff was moderately limited in his ability to understand and remember detailed instructions. Dr. McCarthy felt, as did Dr. Zwissler, that Plaintiff had only a "mild" restriction in the area of activities of daily living. She disagreed with Dr. Zwissler on the

7

rating for difficulty maintaining social function as Dr. McCarthy found no limitation at all, while Dr. Zwissler found a "mild" restriction. Dr. McCarthy also disagreed with Dr. Zwissler on the rating for difficulty maintaining concentration, persistence or pace as Dr. McCarthy found only a "mild" restriction, while Dr. Zwissler saw the same restriction as "moderate" in degree. Neither Dr. Zwissler nor Dr. McCarthy saw that Plaintiff had a significant problem coping with stress or workplace pressure. (Tr, Pgs. 366-382).

In August, 2005, Plaintiff was again tested by Dr. O'Donnell. This time, his Full Scale IQ was 72, his Verbal IQ was 71 and his Performance IQ was 77. Dr. O'Donnell found "mild" impairment of Plaintiff's ability to withstand stress, but "moderate restriction of Plaintiff's ability to relate to others, understand, remember and follow instructions and the ability to maintain attention and concentration." Plaintiff was reading at the second grade level. (Tr., Pgs. 413-421).

## OPINION

Listing 12.05C, which Plaintiff claims that he met, requires proof of mental retardation during the developmental period with deficits in adaptive functioning, initially manifested during the developmental period, a valid Verbal, Performance or Full Scale IQ of 60 through 70 and a physical or mental impairment imposing an additional and significant work-related limitation of function. First, there is no question that Plaintiff proved mental retardation during the developmental period, since he actually received disability benefits during his childhood years. The question is whether his condition has improved to the point that he no longer qualifies for disability benefits. Thus, we must look at his IQ tests and related information since the age of eighteen and to a certain extent, IQ test trends since early childhood.

Dr. Foreman testified that IQ scores become more accurate as a child matures. While theoretically, IQ scores should indicate intellectual capacity, something which in the ideal world should remain a constant, our ability to test intellectual capacity increases as children age. This is the essence of Dr. Foreman's testimony, which is consistent with the way educators and psychologists view the subject of intelligence testing. In any event, Dr. Foreman's testimony on this point is unrebutted.

We know that Plaintiff had IQ tests in 1992, 1995, 1997, 2000, 2003 and 2005. We also

8

know that he had a consistent pattern of scoring higher in the performance area than in the verbal. We also know that Plaintiff consistently showed deficits in reading, although the degree of his demonstrated deficit varied somewhat irregularly. In 1992, when Plaintiff was seven years of age, Dr. Gammel reported that Plaintiff's Full Scale IQ, resulting from testing while Plaintiff was in kindergarten, was 68. His Performance IQ of 72 was the only IQ score of 70 or above. Dr. Gammel felt that Plaintiff had a marked deficit in cognitive development, but no marked functional deficits and therefore, her opinion was that Plaintiff did not meet the Listing at that time.

In 1995, when Plaintiff was in the Fourth grade, his Full Scale IQ was tested at 68, but his Performance IQ increased to 82 and remained the only IQ score greater than 70. In 1997, Dr. Winter reported that Plaintiff's Full Scale IQ, as tested by Dr. Rosenthal in 1997, was 70, a slight increase from previous tests. His Performance IQ was reported as 80, also an increase. The Verbal IQ score of 64 was higher than his first IQ test, but somewhat lower than his later test in 1995. In 2000, Dr. Schmidtgoessling tested Plaintiff and reported a Full Scale and Verbal IQ of 67 and a Performance IQ of 71. One can conclude that prior to the age of eighteen Plaintiff's Full Scale IQ remained fairly consistent at a below-70 level, that his Verbal IQ was very consistent at a below-70 level, while his Performance IQ was equally consistent at an above-70 level.

Then Plaintiff's IQ was tested by Dr. O'Donnell in the year 2003, when Plaintiff was eighteen years of age. This time Plaintiff's Full Scale IQ was 76, his Verbal IQ was 78 and his Performance IQ was 77. The significance is that all scores were over the threshold of 70, and for the first time, Plaintiff's verbal score exceeded his performance score. In 2005, Plaintiff was again tested by Dr. O'Donnell. This time, all scores exceeded the threshold score of 70, with a Full-Scale IQ of 72 and a Performance IQ of 77, which once more exceeded the Verbal IQ of 71. An analysis of all these scores, since the earliest in the kindergarten years, shows a steady upward progression generally with Performance scores generally higher than Verbal scores. Substantial evidence shows that Plaintiff did not meet the criteria for mental retardation after the age of eighteen, although the evidence does demonstrate that he is in the borderline range.

The evidence is overwhelming that Plaintiff also has ADHD, which qualifies as an

9

additional physical or mental impairment, but the Listing requires that the additional impairment impose an additional and significant work-related limitation of function. Met with this requirement, Plaintiff argues that Dr. O'Donnell's opinion was that Plaintiff had moderate limitations in making judgments on simple work-related decisions and interacting appropriately with the public and co-workers. Plaintiff also argues that Dr. O'Donnell found that Plaintiff had a marked restriction of the ability to respond appropriately to work pressures in a usual work setting and to interact appropriately with supervisors. Plaintiff is referring to a checklist Dr. O'Donnell completed in 2005, in which she checked in the "marked" column, Plaintiff's restriction in the categories marked "interact appropriately with supervisors" and "respond appropriately to pressures in a usual work setting." The check marks, however, differ from Dr. O'Donnell's narrative descriptions. Dr. Foreman believed. as did the ALJ and the writer, that when a checklist and a narrative conflict, the narrative is likely more accurate. Especially is this true when substantial evidence supports such a view, as it does in this case.

However, in 2003, Dr. O'Donnell found mild impairments of Plaintiff's ability to relate to others, to withstand pressure and to understand remember and follow simple directions. In 2003, the most serious impairment found by Dr. O'Donnell was a moderate impairment of Plaintiff's ability to maintain attention and concentration. Then in 2005, Plaintiff's functional deficits worsened, according to Dr. O'Donnell. In 2005, she felt that Plaintiff had moderate deficits in his ability to relate to others, maintain attention and concentration, and understand, remember and follow simple instructions. Plaintiff's ability to withstand stress, however, improved from a moderate impairment in 2003 to a mild impairment in 2005.

To the extent that Plaintiff argues that his ADHD imposes an additional work-related and significant limitation of function, we point out that no psychologist ever rated a restriction of his ability to maintain concentration and attention as worse than moderate, that Plaintiff's GAF score increased with age, the latest two of which were 75 and 80, not reflective of serious problems, and that he ceased taking Ritalin at age 16.

Since Plaintiff's IQ scores generally improved as did his GAF scores and since Plaintiff demonstrated no marked deficiencies in the various functional categories, we find no error in the ALJ's decision that Plaintiff failed to meet Listing 12.05C.

10

Plaintiff also asserted that he met Listing 12.05D., which requires, in addition to a valid Verbal, Performance or Full-Scale IQ of 60 through 70, at least two marked restrictions in the categories called (1) activities of daily living, (2) maintaining social functioning, (3) maintaining concentration, persistence or pace or (4) repeated episodes of decompensation, each of extended duration. Dr. Winter did find that Plaintiff met Listing 12.05D when he was 12 years old, but since then, however, he has demonstrated none of the above restrictions to the marked level or extreme level. Plaintiff failed to meet Listing 12.05D as well, and the ALJ's decision in accord was not erroneous.

Plaintiff's First Statement of Errors is that the ALJ erred by finding that Plaintiff's disability ceased. We disagree. An accurate statement of the ALJ's conclusion would be that the Plaintiff's impairment did not cease, but is subject to continuing evaluation, and when evaluated after Plaintiff reached the age of eighteen and had been productively employed for some time, his entitlement to disability benefits ceased. In our opinion, Plaintiff's first Statement of Errors requires us to evaluate the accuracy of the ALJ's residual functional capacity assessment in combination with the Vocational Expert's opinion that Plaintiff could perform the duties of his current job plus a number of other jobs at the medium exertional level. Plaintiff is a young person with no physical limitations. The restrictions, which became a significant part of the rather detailed hypothetical question addressed to the Vocational Expert, were somewhat exaggerated by the ALJ in order to insure fairness to Plaintiff. In other words, the ALJ imposed moderate restrictions of Plaintiff's ability to relate to others, maintain attention and concentration, withstand stress and understand, remember and follow simple instructions, although Dr. O'Donnell's opinion relative to Plaintiff's ability to withstand stress was mildly restricted and Drs. Zwissler and McCarthy found that Plaintiff had no significant problem coping with stress. Although Plaintiff has no physical limitations, the jobs identified by the vocational expert were all at the medium exertional level. We would also point out that although the evidence suggests that Plaintiff's inability to read at or near grade level may have gotten worse with time, the ALJ was careful to include in her hypothetical that job instructions be of the "hands on," rather than contained in written form.

To the extent that Plaintiff's First Statement of Errors differs from and is not subsumed

11

by the Second Statement of Errors, we find that substantial evidence supports the ALJ's finding that Plaintiff is not disabled and therefore not entitled to Social Security benefits.

**IT IS THEREFORE RECOMMENDED** that the ALJ's decision be affirmed and that this case be dismissed from the docket of the Court.

February 21, 2008

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jonathon L. Burghard,
    Plaintiff

Case No. 1:06cv0612

vs.

Commissioner of Social Security,
    Defendant

(Weber, J.; Hogan, M.J.)

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FIFTEEN (15) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).